UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


STATE OF WEST VIRGINIA, by
DARRELL V. McGRAW, JR., ATTORNEY
GENERAL AND ROBERT W. FERGUSON, JR.,
CABINET SECRETARY OF THE WEST VIRGINIA
DEPARTMENT OF ADMINISTRATION,

       Plaintiffs


v.                                Civil Action No. 2:97-0245


UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES AND KATHLEEN SEBELIUS,
SECRETARY OF THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

       Defendants


AMENDED
MEMORANDUM OPINION AND ORDER


       This matter is before the court on the parties' cross

motions for summary judgment, filed by both plaintiffs and

defendants on February 10, 1998.  Plaintiffs, (hereinafter the

"State"), seek summary judgment on Counts I through IV of their

complaint.  Defendants seek judgment on all five Counts.

## I.   Introduction

The United States provides the State of West Virginia with federal matching funds for the contributions the State makes to its retirement pension plan for public employees, the Public Employees Retirement System ("PERS").  (Admin. Rec., at 46 (hereinafter cited as "AR")).  This lawsuit seeks judicial review of a decision by the United States Department of Health and Human Services ("DHHS") that the State had improperly claimed and received $8,131,865 in federal matching funds for its employer contributions to PERS.  DHHS also found that the State had improperly withdrawn funds from the PERS account and used them for unauthorized purposes to the extent of $3,821,670 in federal matching funds, that the State could not offset its debt by the amount the United States had allegedly underfunded the State's Public Employees Insurance Agency Fund (the "Insurance Agency Fund"), and that the State was liable for pre- and post-disallowance interest on the improperly claimed funds.

PERS provides a retirement pension plan for public employees in West Virginia.  (AR, 46).  Its membership includes employees of the State and participating counties and municipalities.  (Id.).  Under PERS, employees contribute 4.5 percent of their salaries to the plan and the employer contributes 9.5 percent.  (Id.).

2

Some PERS beneficiaries work in joint federal-state programs.  On behalf of those employees, the United States provides matching funds for the State's contributions to PERS. The determination as to what portion of the State's costs are reimbursable by the federal government, or "allowable," is made by DHHS pursuant to the guidelines set forth in the Office of Management and Budget's Circular A-87, Cost Principles for State and Local Governments ("Circular A-87").[1]  For costs to be allowable under a federal matching program, they must be "consistent with policies, regulations, and procedures that apply uniformly to both federally assisted and other activities of the unit of government of which the grantee is a part."  (Id., Att. A., ¶ C.1.d.).  DHHS interprets this requirement to mean that the United States will contribute to PERS at the same rate as the State.  (AR, 37-38, 43).

Contributions to PERS must be "net of all applicable credits."  (Circular A-87, Att. A., ¶ C.1.f.).  "Applicable credits" are "those receipts or reduction of expenditure type

_____

[1]  Circular A-87 applies to all federal agencies responsible for administering federally-funded grants and contracts, including DHHS.  Circular A-87, Att. A, ¶ A.3; 45 C.F.R. § 74.27(a).  Circular A-87 has been incorporated by reference into DHHS's regulations at 45 C.F.R. § 74.27(a).  Thus, it carries the force of a substantive regulation.  Pennsylvania Dep't of Pub. Welfare v. Heckler, 730 F.3d 923, 925 n. 1 (3d Cir. 1984) (referring to the predecessor regulation, 45 C.F.R. § 74.171).

transactions which offset or reduce expense items allocable to grants as direct or indirect costs."  (Id., ¶ C.3.a.).  Here, the disallowance made by DHHS of the State's overcharges constitutes an applicable credit that the State must deduct from its claim for matching funds from the federal government. (See Id.).

In or around September of 1989, DHHS informed the State of its intent to commence an audit of PERS and the Insurance Agency Fund to determine the propriety of costs charged by the State to various federal programs administered by a number of federal agencies between July 1, 1985, and June 30, 1989.  (AR, 47).  It is not clear from the record which or how many federal agencies were involved, although DHHS asserts in a September 29, 2009, reply brief that there were "overcharges by the State to various federal programs administered by approximately twenty-five federal agencies . . . ."  (Defs.' Reply at 6).  In September of 1990, an audit was completed by DHHS with respect to excess pension costs charged to federal programs by PERS during the period in question.  (AR, 42).  The audit concluded that the United States was overcharged $12,741,426 as a result of the State requesting matching funds for PERS at a higher contribution rate than that authorized by Circular A-87.  (AR, 49).  DHHS also determined that the United States had lost $3,161,690 in interest income because of the excessive PERS charges.  (Id.).

The audit further found that the State had withdrawn $15,171,377 from PERS to fund the general obligations of the State and $3,936,973 to pay for health insurance premiums for its retirees, aggregating $19,108,350.  (Id.).  DHHS determined that twenty-percent of these withdrawals, or $3,821,670, was attributable to past federal contributions to PERS and would have to be returned to the United States.  (Id.).  DHHS did not complete an audit of the Insurance Agency Fund, and no mention of the Fund was made in the audit.[2]

The State elected to have the Insurance Agency Fund audited at its expense and submitted its audit findings to DHHS. The State claimed its audit established that the United States underfunded the Insurance Agency Fund by $9,541,125, and asked DHHS to allow the State to offset this amount against the monies owed with respect to PERS.  (Complaint, ¶¶ 75-77).  The State does not specify which federal agency or agencies has underfunded the Insurance Agency Fund.

The findings and conclusions contained in the audit were adopted by DHHS, by letter dated March 13, 1991, when it

---

[2]  According to defendants, the audit was discontinued because there was no indication that the Insurance Agency Fund had overcharged the United States.  (Defendants' Response, at 15).

formally disallowed the excessive charges found above.  (AR, 37-40).  By separate letter bearing the same date, DHHS also informed the State that it would not be permitted to offset the funds allegedly owed by the United States to the Insurance Agency Fund to satisfy the debts owed by the State with respect to PERS because allowance of such an offset would circumvent federal regulations.  (AR, 207-8).  In reaching this conclusion, DHHS relied upon Circular A-87, ¶ C.2.b, which provides that "[a]ny cost allocable to a particular grant or cost objective under the principles provided for in this Circular may not be shifted to other Federal grant programs to overcome fund deficiencies."  Id.

The State subsequently requested, pursuant to 45 C.F.R. § 75, that DHHS reconsider its findings.  Specifically, the state claimed that:

A.    The Audit failed to consider pension contributions made from special funds when it calculated the State's overall contribution rate, thus resulting in an overcalculation of the pension-cost disallowance;

B.    DHHS had no authority to impose interest charges for the period preceding the disallowance, and in any event the interest should be calculated on the "actual interest earnings" of PERS rather than the "average annual yield" figures utilized by the audit;

C.    The Audit overestimated the amount of federal funds withdrawn from PERS, and also failed to account for the fact that a portion of the withdrawn funds were used to fund the federal share of retiree medical insurance costs; and

6

> D.   The disallowances should be offset against the federal
>      share of costs incurred by the State to remedy
>      underfunding of PEIA.

(Pls.' Memo., at 3-4 (citing AR, 68-136)).

In support of its request, the State re-submitted to DHHS its independent auditor's report.  Again, the State claimed it was entitled to an offset against its debts because of an alleged underfunding of the Insurance Agency Fund.

DHHS completed its reconsideration and issued its decision on June 25, 1993.  DHHS agreed that contributions to PERS from special funds should be included when calculating the amount the State had overcharged the United States.  Thus, DHHS accepted the State's calculation that the overcharge was $8,131,865 rather than $12,724,786.  (AR, 5).  DHHS also accepted the methodology proposed by the State to calculate pre-disallowance interest.[3]  (AR, 6).  DHHS upheld the audit findings in all other respects.  (AR, 7).

On administrative appeal, DHHS's Appeals Board upheld the agency's earlier determinations, finding that:

> West Virginia may not properly use its
> [Insurance Agency Fund] claims against the

---

[3]  The State nevertheless maintains that it is not liable for any pre-disallowance interest.

7

> federal government to offset the disallowance
> taken here.
>
>       * * *
>
> West Virginia must pay the federal government
> $8,131,865 due as a result of overcharges
> made to PERS.
>
> West Virginia must remit the interest earned
> on the amount the federal government was
> overcharged.
>
>       * * *
>
> West Virginia must remit the federal share,
> or $3,821,670, of the funds it withdrew from
> PERS during the period in question.

(AR, 291).[4]

   The State instituted this action on March 12, 1997. The complaint contains five counts.  Count I alleges that DHHS had no authority to assert an aggregate disallowance against the State on behalf of other federal agencies.  Count II alleges that DHHS's determination of the federal share of the unauthorized withdrawals from PERS was arbitrary and capricious.  Count III challenges DHHS's authority to assess any pre-disallowance interest whatsoever, and Count IV challenges DHHS's authority to assess interest at a rate of 15.75% against the State.  Count V challenges DHHS's authority to deny the State's offset claim

---

   [4] On March 21, 1997, DHHS demanded payment of $25,163,582.41, an amount which included accrued interest, from the State.

without undertaking an audit of the Insurance Agency Fund or itemizing its findings, and seeks a declaration that the State may offset monies allegedly owed by the United States against its own debt.

## II.  Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a party fails to establish an essential element of the cause of action, the opposing party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  That is, a defendant satisfies its requirement of showing that it is entitled to judgment as a matter of law by demonstrating that there is an absence of evidence to support the plaintiff's claims.  Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994), cert. denied, 115 S. Ct. 1254 (1995).  A defendant is also entitled to summary judgment if the record as a

whole could not lead a rational trier of fact to find in favor of the plaintiff.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

### III.  Judicial Review Standard

The State's cause of action arises under the Administrative Procedure Act ("APA"), § 5 U.S.C. 706.  The APA provides the following standard for judicial review of final, informal agency actions:[5]

> The reviewing court shall--
>
> * * *
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law; . . . .

§5 U.S.C. § 706(2)(A)-(D); Fisherman's Dock Coop., Inc. v. Brown, 75 F.3d 164, 167 (4th Cir. 1996).

---

[5]  Informal agency actions are those actions, as are at issue here, that may be taken by an agency without the benefit of a statutorily required hearing and the creation of a formal record.  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414 (1971).

Here, the State claims that a multitude of the actions taken by DHHS were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  The State bears the burden on all issues in this case -- it must show that the agency's actions were arbitrary, capricious, an abuse of discretion, or contrary to law, or its claims must fail.  The Fund for Animals, Inc.  v. Rice, 85 F.3d 535, 548 (8th Cir. 1996).

An agency rule may be deemed arbitrary, capricious or an abuse of discretion

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfr's Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Although the scope of judicial review under this standard is narrow and deferential, a reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.  Id.; See also Natural Resources Defense Council, Inc. v. SEC, 606 F.2d

11

1031, 1049 (D.C. Cir. 1979).  But, a reviewing court cannot "substitute its judgment for that of the agency," Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), particularly when that determination is propelled by the agency's expertise.  See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103 (1983); Federal Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972).

In reviewing agency actions under the APA, the court must heed several well-established limitations.  First, the agency's actions are presumed to be lawful and correct.  Overton Park, 401 U.S. at 416.  Second, the agency's conclusions can be overturned only if arbitrary and capricious, giving due deference to the agency's expertise and judgment.  Id.; Baltimore Gas, 462 U.S. at 103.  Third, the agency's legal interpretations are controlling if they are reasonable with regard to statutes, Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984), or not plainly erroneous with regard to the agency's own regulations.  Bowles v. Seminole Rock Co., 325 U.S. 410, 414 (1945).

IV.  DHHS's Authority to Impose an Aggregate Disallowance

In Count I of its complaint, the State argues for the first time that DHHS did not have the statutory authority to assess an aggregate disallowance against the State on behalf of all federal agencies, and, in the alternative, that DHHS must break its aggregate disallowance down into itemized findings indicating the amounts overcharged to each federal program. Defendants argue that DHHS has the authority to impose an aggregate disallowance and that it need not issue itemized findings.  Defendants also argue that the court cannot consider the State's claims with respect to DHHS's audit authority because they were not raised before DHHS during the agency proceedings.

A.  The State's Introduction of New Issues Before this Court

The Supreme Court has long held that it is inappropriate for courts to consider arguments not raised before the administrative agency on appeal of the agency decision, because doing so usurps the agency's function.  <u>Unemployment Compensation Comm. of Territory of Alaska v. Aragan</u>, 329 U.S. 143, 155, (1946);  <u>see also</u>, <u>Perales v. Heckler</u>, 611 F. Supp. 333, 344, <u>aff'd</u>, 762 F.2d 226 (2d Cir. 1985).  As the Court

13

stated in <u>United States v. L.A. Tucker Truck Lines, Inc.</u>, 344

U.S. 33 (1952):

> Simple fairness to those who are engaged in
> the tasks of administration, and to
> litigants, requires as a general rule that
> courts should not topple over administrative
> decisions unless the administrative body not
> only has erred but has erred against
> objection made at the time appropriate under
> its practice.

<u>Id.</u> at 36.

This doctrine serves numerous goals: implementing

congressional intent to delegate authority to the agency;

protecting agency autonomy by allowing the agency to apply its

special expertise and correct its errors; furthering efficient

judicial review by permitting the parties to develop the facts of

the case in the agency proceedings; promoting judicial economy by

avoiding repetition of administrative and judicial fact finding;

and conserving judicial resources.  Jon C. Dubin, <u>Torquemada</u>

<u>Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine</u>

<u>to Inquisitorial Administrative Proceedings</u>, 97 COLUM. L. REV.

1289, 1307 (1997); <u>see also</u>, <u>e.g.</u>, <u>Pavano v. Shalala</u>, 95 F.3d

147, 150 (2d Cir. 1996); <u>Abbey v. Sullivan</u>, 978 F.2d 37, 44-45

(2d Cir. 1992).

As explained by two notable commentators, there are three different types of circumstances where the doctrine comes into play:

> First, a litigant may seek court review of a claim that he or she has never submitted to the agency.  This is the classical situation of exhaustion . . . . [and] [i]t presents the strongest reasons for requiring exhaustion.  Second, a litigant may seek court review of a claim that he or she has presented to the agency, which has rejected it.  However, the controversy includes other claims that are the subject of ongoing agency proceedings and have not yet been decided.  This is the problem of interlocutory review.  Third, a litigant may seek court review of a claim when agency proceedings are over, and where he or she did not raise (or did not pursue) the claim before the agency.

Stephen G. Breyer & Richard B. Stewart, ADMINISTRATIVE LAW AND REGULATORY POLICY, 1115 (3d ed. 1992).  This third form of exhaustion, called "issue exhaustion," provides the basis of defendants' argument in this case.  Defendants contend that, because the State did not challenge DHHS's authority to perform an audit on behalf of all affected federal agencies during the administrative proceedings, the court may not consider such a challenge here.

Issue exhaustion is a judge made, common law prudential principle, which need not be invoked in all circumstances.  See Pleasant Valley Hospital, Inc. v. Shalala, 32 F.3d 67, 70 (4th

15

Cir. 1994).  Because of its discretionary nature, the doctrine has become subject to several exceptions.  One such exception, established by the United States Court of Appeals for the District of Columbia Circuit, applies when the issues raised for the first time before a district court are strictly legal.  E.g., Atlantic Richfield Co. v. U.S. Dep't of Energy, 769 F.2d 771, 782 (D.C. Cir. 1984); Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, 707 F.2d 1485, 1488-1489 (D.C. Cir. 1983).  Under such circumstances, no factual development or application of agency expertise will aid the court's decision.  See McKart v. United States, 395 U.S. 185, 200 (1969).  Because the courts are "relatively more expert" in ascertaining the meaning of statutory terms, review would not impermissibly displace agency skill or invade the field of agency discretion.  Barlow v. Collins, 397 U.S. 159, 166 (1970), quoting Hardin v. Kentucky Utils. Co., 390 U.S. 1, 14 (1968) (dissenting opinion).

DHHS relies considerably on Pleasant Valley Hospital v. Shalala in support of its contention that issue exhaustion should be invoked here to bar the State's claim.  In Pleasant Valley, a medicare provider sought review of a Health Care Financing Administration decision that interest earned on a particular account could not be used as a shelter against a claimed offset.

On appeal to the district court, the provider challenged, for the
first time, the validity of the relevant regulations, arguing
that the agency had failed to comply with the notice and comment
provisions of the APA when promulgating the regulations.
Pleasant Valley, 32 F. 3d at 69.

        The district court held that it did not have subject
matter jurisdiction over the provider's claim because the claim
had not been raised before the agency.  The United States Court
of Appeals for the Fourth Circuit ("Fourth Circuit") affirmed the
district court's decision.  The court stated that, as a general
rule, it is inappropriate for courts reviewing appeals of agency
decisions to consider arguments not raised before the
administrative agency involved.  Id. at 70.  The court then held
that:

> While this general rule is not a strict
> jurisdictional bar, it is a prudential one
> which we invoke here.  In this instance . . .
> the [agency's] expertise is relevant.
> Specifically, the [agency's] expertise would
> be relevant in determining whether the agency
> had properly promulgated the [regulations].
> Because [the agency] has [not] had occasion
> to issue a final decision on this aspect of
> Pleasant Valley's claim, the district court
> properly declined to decide the APA issue.

Id.

The circumstances of <u>Pleasant Valley</u> are, however, distinguishable from those alleged in Count I of the State's Complaint.  In <u>Pleasant Valley</u>, the challenge made for the first time before the district court involved allegations that the proper procedures were not followed when promulgating the regulations -- a distinctly factual issue.  Here, the State challenges DHHS's authority to perform an audit and assess an aggregate disallowance -- a purely legal issue.  That being the case, the State's claim falls outside the parameters of <u>Pleasant Valley</u> and squarely within the exception relied upon by the District of Columbia Circuit in <u>Atlantic Richfield Co. v. U.S. Dep't of Energy</u>, 769 F.2d at 782, and <u>Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n</u>, 707 F.2d at 1488-1489.  Because Count I involves a purely legal issue, the court can review it without usurping agency function.  Accordingly, the court must now determine whether DHHS had the authority to audit PERS and impose an aggregate disallowance upon the State on behalf of all federal agencies, and whether DHHS must itemize its findings.


B.  DHHS's Audit Authority


The State contends that the United States Department of Labor ("DOL"), not DHHS, is the "cognizant agency" empowered

18

to audit PERS and impose an aggregate disallowance.  Defendants
contend that DHHS is, in fact, empowered to audit PERS and impose
an aggregate disallowance, pursuant to the audit provisions of 45
C.F.R. Part 74, App. J, OMB Circular A-128 (1993), and pursuant
to its authority to negotiate state-wide cost allocation plans on
behalf of all federal agencies under OMB Circular A-87.  DHHS
argues that, as the agency required to ensure that the United
States contributes the proper amount to federally subsidized
programs each year pursuant to Circular A-87, it has the right
and the responsibility to audit such programs.  Otherwise, says
DHHS, it would be unable to carry out its obligations under the
Circular.

It is undisputed that the authority exercised by DHHS's
in this case derives, if at all, from OMB Circular A-87[6] and OMB
Circular A-128.   Circular A-128 was issued pursuant to the
Single Audit Act of 1984, 31 U.S.C. §§ 7501-7507, which
establishes audit requirements for state and local governments
that receive federal aid, and defines federal responsibilities
for implementing and monitoring those requirements.  Circular A-

---

[6]  As stated above, _supra_ note 1, Circular A-87 has been
incorporated by reference into DHHS's regulations at 45 C.F.R. §
74.27(a).  Thus, it carries the force of a substantive
regulation.

128, ¶ 1.  Circular A-128 provides that state or local
governments that receive $100,000 or more in federal financial
assistance during a particular year shall be audited for that
year.  Id., ¶ 5.  The Director of the Office of Management and
Budget shall specify the "cognizant" federal agencies authorized
to perform these yearly audits.  31 U.S.C. § 7504 (1984).  The
cognizant agency is responsible, among other things, for ensuring
that the audits are performed and for coordinating audits made by
other federal agencies with respect to various programs which are
in addition to the audits performed pursuant to the Single Audit
Act.  Circular A-128, ¶¶ 10, 11.b.(1),(6).  The DOL has been
named the cognizant agency responsible for performing the yearly
audits required by the Single Audit Act in West Virginia and for
coordinating audits made by other federal agencies.  Circular A-
87, 50 Fed. Reg. 52,406 (1985).

        Although DOL is the agency responsible for performing
the audits required by the Single Audit Act, DHHS is the
cognizant agency responsible for negotiating state-wide cost
allocation plans for all states under Circular A-87.  That is,
DHHS is responsible for ensuring that the cost principles set
forth in Circular A-87 are followed so that the United States
only pays its fair share of funding for federally subsidized
pension programs such as PERS.  As the cognizant federal agency,

DHHS is responsible for negotiating the rates of federal
contributions to a particular program, including PERS, on behalf
of all federal agencies contributing to the program.  Circular
A-87 ¶ J.4.a.  According to defendants, this responsibility
carries with it a duty to audit costs West Virginia charges to
the federal government for federally assisted programs to ensure
that they are properly reimbursable.  Id.  Among these costs are
employee pension benefits.  Id., Att. B, ¶ B.13.b.

Circular A-128 specifically contemplates the
performance of audits in addition to the yearly audit required by
the Single Audit Act.  With respect to such additional audits,
the Circular states:

> The Single Audit Act provides that an audit
> made in accordance with [Circular A-128]
> shall be in lieu of any financial or
> financial compliance audit required under
> individual Federal assistance programs.  To
> the extent that a single audit provides
> Federal agencies with information and
> assurances they need to carry out their
> overall responsibilities, they shall rely
> upon and use such information.  However, a
> Federal agency shall make any additional
> audits which are necessary to carry out its
> responsibilities under federal law and
> regulation.  Any additional Federal audit
> effort shall be planned and carried out in
> such a way as to avoid duplication.

Circular A-128, ¶ 10.  Circular A-128 also specifically
contemplates audit findings which affect the programs of more

than one federal agency, requiring the cognizant agency to
"monitor the resolution of audit findings that affect the
programs of more than one federal agency."  Circular A-128, ¶ 14.
Pursuant to these provisions, DHHS informed the DOL, by letter
dated June 29, 1989, of its intention to "build upon the single
audit recently conducted" by auditing PERS to determine whether
the State had acted in accordance with Circular A-87.[7]  (Pls.'
Resp, Ex. A).  DHHS then audited PERS to determine whether the
State had overcharged federal programs committed to contributing
matching funds to PERS, and, finding that it had, asserted the
aggregate disallowance against the State.

        The court finds that DHHS's actions were necessary to
carry out its overall responsibilities under Circular A-87.
DHHS is the agency entrusted with the task of negotiating state-
wide cost allocation plans consistent with the provisions of
Circular A-87.  To ensure that funds are properly allocated
between the states and the United States on a yearly basis, DHHS
must have access to information regarding the specific sums
contributed by each state to programs entitled to federal
matching funds.  An audit would efficiently provide that
information, and is an appropriate exercise of DHHS's authority
under Circular A-87.

_____

        [7]  The scope of the "recently conducted" audit cannot be
discerned from the record.

Moreover, although Circular A-128 names DOL as the agency empowered to conduct the annual audits required by the Single Audit Act, it does not preclude audits by other agencies. In fact, by its own terms, the Circular may not be relied upon to "limit the authority of Federal agencies to make, or contract for audits and evaluations of Federal financial assistance programs," or to "authorize any State or local government . . . to constrain Federal agencies, in any manner, from carrying out additional audits."  Circular A-128, ¶¶ 10(b), (c).

Accordingly, the court finds that DHHS had the authority, pursuant to Circulars A-87 and A-128, to conduct an audit of DHHS and, as further set forth _infra_, pages 24-26, to issue an aggregate disallowance on behalf of all federal agencies affected by the State's wrongdoing.

C.  Itemization of Findings

The State argues that DHHS is required to itemize its audit findings by individual federal program.  The State cites to ¶ 13.a.1 of Circular A-128 in support of its argument.  That paragraph states that audit reports must include "a schedule of Federal assistance, showing the total expenditures for each Federal assistance program. . . ."  Paragraph 13.a.1, however,

23

applies to the yearly audit required by the Single Audit Act and
governed by Circular A-128, not to all audits prepared by all
agencies.  Paragraph 13 governs audits "made in accordance with
the provisions of [Circular A-128]."  Circular A-128 only governs
the annual audits of certain programs required by and performed
pursuant to the Single Audit Act of 1984.  Circular A-128, ¶ 1.
The PERS audit was not an annual audit required by the Single
Audit Act.  Rather, it was an audit performed by DHHS pursuant to
its duty, established by Circular A-87, to ensure that the cost
principles set forth in Circular A-87 are followed so that the
United States only pays its fair share of funding for programs
such as PERS.  In addition to the authority of Circular A-128 at
¶ 10 (infra at 22), such audits are specifically contemplated by
the Single Audit Act.  It provided, at all times relevant to this
lawsuit, that, aside from the annual audit required by the Act,
"a Federal agency shall conduct any additional audits which are
necessary to carry out its responsibilities under Federal law or
regulation."  31 U.S.C. § 7503.  Thus, paragraph 13 does not
apply to the PERS audit.

        Plaintiffs also cite to 45 C.F.R. § 95.519(b)(1) in
support of its contention.  That section is also not applicable
here.  It pertains only to those public assistance programs
listed in 45 C.F.R. § 95.503.[8]

---

        [8]  Part 95 of Title 45 of the Code of Federal Regulations
only applies to State agency costs applicable to awards made

In any event, it appears that imposing an itemization requirement upon DHHS would burden the agency with an unnecessary expense.  Circular A-87 requires DHHS to negotiate cost allocation plans for federally subsidized programs on an aggregate basis.  DHHS's task is, thus, to determine the contribution rate for all federal agencies contributing to the particular program.  Contributions must be consistent with the rate selected by DHHS after negotiations with the grantee.  If questions arise over the appropriateness of the chosen rate, DHHS may audit the program.  Such an audit will compare the aggregate contributions by a state and its employees to the contributions made by the United States.  If the ratio indicates one group is bearing more than its fair share, the contribution rate will be adjusted.  An itemization of agency-by-agency contributions is not necessary to perform this analysis.  All DHHS must determine is that the United States, as a whole, is bearing only its fair share of costs.

Plaintiffs have advanced no other authority or reasons supporting their conclusion that an itemization of State

---

under Titles I, IV-A, IV-B, IV-C, IV-D, IV-E, X, XIV, XVI (AABD), and XIX of the Social Security Act, under the Refugee Act of 1980, Title IV, Chapter 2 of the Immigration and Nationality Act (8 U.S.C. 1521 et seq.), and under Title V of Pub. L. 96-422, the Refugee Education Assistance Act of 1980.  45 C.F.R. § 95.503.

overcharges is necessary in this case.  Accordingly, the lack of
such an itemization in the PERS audit is not fatal.[9]  Having
determined that DHHS had the authority to audit PERS, issue an
aggregate disallowance, and issue a report without itemized
findings, the court holds that the defendants are entitled to
summary judgment on Count I of the State's complaint.

### V.  Federal Share of State Withdrawals

Aside from revealing State overcharges, the PERS audit
found that West Virginia had used $15,171,377 unlawfully
withdrawn from PERS to fund general obligations of the State and
$3,936,973 of PERS funds unlawfully withdrawn to finance health
insurance premiums for retired state employees, aggregating
$19,108,350.  (AR, 286).  The State does not dispute this
finding, and acknowledges that it must refund the federal share
of PERS funds used for state purposes, which DHHS calculates to
be twenty-percent or $3,821,670.  In Count II, the State takes
exception to DHHS's calculation of the federal share of the
withdrawn funds.

---

[9]  As will be seen, however, the failure of DHHS to itemize
the overcharges impedes its ability to impose interest on the
aggregate disallowance at rates unavailable to other federal
agencies.

26

In the draft audit report, the auditor stated his conclusion with respect to the federal share of the unauthorized withdrawals as follows:

> The State could not provide us with the actual federal share of the $19,108,350 withdrawn from PERS.  The Office of Inspector General['s] experience is that in lieu of exact figures provided by States, a conservative estimate of the federal share of salary and related expenditures, such as pension costs, is 20 percent.  In the absence of more precise data, we used 20 percent and estimated the Federal share of the transferred funds to be $3,821,670.

(AR, 58).

This reasoning was accepted by DHHS and incorporated into the formal disallowance dated March 13, 1991.  (AR, 39). Upon reconsideration, DHHS performed an additional analysis of the twenty-percent estimate.  To test its reasonableness, Stephen Virbitsky, a DHHS auditor, compared the twenty-percent estimate with the ratio of federal PERS contributions to total contributions made by the State during the four year audit period.  (AR, 276).  During that period, all state employer contributions, including all federal contributions, were deposited into a division of the PERS called the State Employer Accumulation Fund ("EAF State Fund").  (AR, 276).  Contributions by county and local governments were deposited into a different division called the Non-State Employer Accumulation Fund ("EAF

27

Non-State Fund").  (<u>Id.</u>).  Contributions by employees were deposited into yet another division -- the "Member Funds." (<u>Id.</u>).

Because all federal and State funds were deposited only into the EAF State Fund, Mr. Virbitsky limited his analysis to that particular division.  Using the amounts actually deposited into the EAF State Fund, he computed the federal share of total contributions for the years 1986-89.  His results indicated that the federal share of employer contributions was 20.52% in 1986, 33.69% in 1987, 23.45% in 1988, and 20.34% in 1989, averaging 22.84%.  (AR, 277).

The DHHS Appeals Board expressly endorsed this analysis in its decision, and undertook a further analysis of its own. (AR, 287-90).  The Appeals Board chose to test the reasonableness of Mr. Virbitsky's calculations by comparing the amount of federal funds deposited to the sum of State funds actually deposited into the EAF State Fund plus the amount the State would have contributed had it properly funded PERS.  (AR, 289).  The Appeals Board concluded that "[s]ince the ratios derived from this comparison would range from 18.4 percent to 26.3 percent, these calculations also support the 20 percent as a reasonable estimate for the four year period."  (<u>Id.</u>).

The State claims that DHHS's estimate is "arbitrary and capricious because (1) the agency failed to take into account the entire PERS fund, including contributions made by non-state employers and employees, and (2) it aggregated both allowed and disallowed federal contributions to establish the ratio of federal-to-State contributions to PERS, where State pension funding [for the four year audit period] was conceded to be anomalously low. . . ."  (Pls' Memo., at 12).

DHHS's conclusions can be overturned only if they are found to be arbitrary and capricious, giving due deference to the agency's expertise and judgment.  Overton Park, 401 U.S. at 416; Baltimore Gas, 462 U.S. at 103.  Agency action may be deemed arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfr's Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)

The agency's decision not to include the EAF Non-State Fund and the Member's Fund in its analysis was not arbitrary or capricious.  DHHS chose to base its calculations on the only account subject to unauthorized withdrawals that contained both federal and state funds.  There is no indication in the record that the State withdrew any monies from the Member Funds.  (AR, 288).  DHHS also determined that the exclusion of any unauthorized withdrawals from the EAF Non-State Fund from its calculations was appropriate because no federal funds were deposited into that account.  (Id.).

Similarly, the inclusion of both allowed and disallowed contributions in the calculations was not arbitrary or capricious.  The State's unauthorized withdrawals from the EAF State Fund included both allowed and disallowed contributions.  Thus, to be accurate, any estimate of the federal share of those withdrawals should include both types of contributions.  (AR, 192).

The court finds that DHHS properly explained the basis of its twenty-percent estimate and based its conclusions on the evidence before the agency.  Accordingly, for the reasons stated, DHHS's estimate of the federal share of unauthorized withdrawals was not arbitrary or capricious.  Defendant's motion for summary

judgment with respect to Count II of the State's complaint will be granted.

### VI.  The State's Challenges to DHHS's Imposition of Interest

As correctly noted by defendants, there are two assessments of interest at issue in this case.  First, DHHS has claimed interest due on the PERS overcharges for the period running from July 1, 1985, through June 30, 1989.  DHHS calculated this pre-disallowance interest to be $897,321.  The calculation itself is not in dispute.  (Pls.' Frst. Mot. to Supp. the Admin. Rec., at 1).  DHHS also claims interest, at the rate of 15.75%, which began to accrue thirty days after March 13, 1991, when official notice of the debt was issued.  The State argues that DHHS cannot impose prejudgment interest upon the State's debt and cannot impose interest at the consumer rate.

### A.  DHHS's Imposition of Pre-Disallowance Interest

In Count III of its complaint, the State contends that DHHS has no authority to impose pre-disallowance interest against it in this case.  Defendants respond that DHHS has authority to assess pre-disallowance interest based upon United States v.

31

**Texas**, 507 U.S. 529 (1993), and upon the DHHS claims collection
regulations, 45 C.F.R. §§ 30 **et seq.**, promulgated pursuant to the
Debt Collection Act of 1982, 31 U.S.C. §§ 3701 **et seq.**[10]

The claims collection regulations prescribe standards
and procedures for the DHHS personnel charged with collection and
disposition of debts owed to the United States.  45 C.F.R.
§ 30.1.  "Debts" include, among other things, overpayments
arising from audit disallowances.  **Id.** at § 30.2.  The
regulations expressly provide for the collection of interest on
unpaid debts.  "Interest will accrue on all debts from the date
notice of the debt and the interest requirement is first mailed
to the last known address or hand-delivered to the debtor if the
debt is not paid within 30 days from the date of mailing of the
notice."  **Id.** at § 30.13(a)(1).  The regulatory preamble to the
claims collection regulations provides that interest will be
charged under § 30.13 to state and local governments the same as
any other debtor.  52 Fed. Reg. 260, 261 (1987).

---

[10]  Defendants also claim, as they did with respect to the
State's arguments regarding DHHS's audit authority, that the
court may not consider the State's two challenges to the
imposition of interest because they were not raised before the
agency.  Those challenges, however, raise purely legal issues.
Accordingly, they may be considered for the first time here.
Atlantic Richfield Co. v. U.S. Dep't of Energy, 769 F.2d 771, 782
(D.C. Cir. 1984); Athlone Indus., Inc. v. Consumer Prod. Safety
Comm'n, 707 F.2d 1485, 1488-1489 (D.C. Cir. 1983).

The United States Supreme Court has expressly upheld the authority of an agency to impose prejudgment interest on debts owed by the states.  United States v. Texas, 507 U.S. at 539.  Texas involved a challenge to an imposition of prejudgment interest on debt owed by a state to the United States.  As is the case here, the interest was imposed by a federal agency (the Food and Nutrition Service), and began to accrue thirty days after notice of the debt was issued.  The state of Texas challenged the imposition of interest, arguing that the Debt Collection Act had abrogated the agency's common law authority to make such an imposition.  The Court rejected the state's argument, and held that the Debt Collection Act left in place the States' federal common-law obligation to pay  prejudgment interest on debts owed to the Federal Government.  Texas, 507 U.S. at 538.

Similar circumstances are presented here.  By letter dated March 13, 1991, DHHS issued the notice contemplated by 45 C.F.R. § 30.13(a)(1).  The notice set out the final decision of DHHS's Office of Inspector General/Office of Audit Services, and then read:

> This letter constitutes the initial
> notification of a claim by the United States
> as required by the Federal Claims Collection
> Standards.  If payment is not received within
> 30 days from the date of this notification,
> interest at the current Private Consumer Rate

33

> from the date of this notice will be assessed
> in accordance with Department Regulations, 45
> C.F.R. Part 30.13 . . . If your organization
> elects to appeal, we will suspend collection
> action.  However, if the final decision of
> the appeals process is determined in favor of
> the federal government (fully or partially)
> interest will be assessed on the upheld
> amount from the date of this notification.

(AR, 40).

United States v. Texas clearly permits such agency action.

Moreover, DHHS's regulation, 45 C.F.R. § 30.13, expressly

authorizes the imposition of prejudgment interest against the

State beginning the date notice was issued.

There remains a question as to how 45 C.F.R. §

30.13(a)(1) supports DHHS's imposition of pre-disallowance

interest for a period running from July 1, 1985, through June 30,

1989.  Section 30.13(a)(1) provides that:

> "[i]nterest will accrue on all debts from the
> date of notice of the debt and the interest
> requirement is first mailed to the last known
> address or hand-delivered to the debtor if
> the debt is not paid within 30 days from the
> date of mailing of the notice."

DHHS issued the notice contemplated by § 30.13(a)(1) on March 13,

1991.  DHHS contends that pre-disallowance interest is deemed

part of the disallowance itself.  Under DHHS regulations,

allowable costs must be "net of all applicable credits."  OMB

Circular A-87, 46 Fed. Reg. 9548 (1981), Attachment A, ¶ C.1.g.

Applicable credits are "those receipts or reduction of
expenditure-like transactions which offset or reduce" monies
allocable to grants made by the federal government.  Id., ¶
C.3.9.  In its final determination, DHHS concluded that
"[i]nterest income falls within the plain meaning of 'applicable
credit' since earnings derived from federal funds are clearly
receipts which offset grant costs."  (AR, 285).  Consequently,
DHHS included $897,321 in accrued interest in the total
disallowance.

DHHS's conclusion is in accord with two district court
opinions cited by DHHS.  New York Dep't of Social Services v.
Shalala, 876 F. Supp. 29, 32 (S.D.N.Y. 1994) (concluding that
interest earned on federal funds permaturely acquired by the
state constituted an 'applicable credit' under OMB Circular A-
87), aff'd 50 F.3d 179 (2d Cir. 1995); State of North Carolina v.
Heckler, 584 F. Supp. 179, 185 (E.D.N.C. 1984) (concluding that
interest earned by a state on wrongfully received federal funds
retained the character of the principal and, therefore, were
subject to disallowance to the same extent as the principal).

The conclusion is also consistent with the long-
standing rule that "holders of federal grant money are required,
absent specific authorization, to refund any interest earned on

that money to the federal government."  Pennsylvania Office of
the Budget v. Department of Health and Human Services, 996 F.2d
1505, 1510-11 (3d Cir. 1993), cert denied, 510 U.S. 1010 (1993),
and the general rule that "a party who has had the use of money
owed to another party may justly be required from the time the
payment should have been originally made."  M.B.A.F.B. Federal
Credit Union v. Cumis Ins. Agency, 507 F. Supp. 794, 798 (D.S.C.
1981) (citing Chesapeake and Ohio Railway Co. v. Elk Refining
Co., 186 F.2d 30, 33 (4th Cir. 1950)).

        The State argues that Shalala and Heckler are
inapplicable to the facts at hand inasmuch as in both cases,
wrongfully held funds were initially placed in interest-bearing
accounts and subsequently transferred to grant programs.  Because
all federal funds at issue in this case were immediately
transferred to PERS, the State contends it lacks title to any
interest earned on the overcharges and cannot issue a refund.

        Acceptance of the State's contention would create
inconsistent results.  The court has concluded that DHHS is
entitled to repayment of overcharges made by the State.  The
State has not contested that conclusion, despite the fact that
those overcharges were immediately transferred to PERS upon
receipt of the funds from the United States.  The assertion that

interest earned on the overcharges is beyond the State's reach
while the principal is not is incongruous.

In any event, the State's argument does not address the
precise issue at hand:  whether interest earned on wrongfully
held funds may be deemed "applicable credits" and included as
part of a DHHS disallowance.  DHHS concluded that such treatment
is appropriate.  In view of the authority set forth above, the
court finds that DHHS's conclusion is not arbitrary and
capricious.  Plaintiffs' motion for summary judgment with respect
to Count III is accordingly denied.

      B.    Imposition of the Consumer Interest Rate Upon the
           State's Debt

In Count IV of its complaint, the State also challenges
DHHS's imposition of a 15.75% interest rate upon the total debt
owed on the following grounds: (1) that 45 C.F.R. § 30.13
conflicts with the common law rule that required a consideration
of competing state and federal interests before prejudgment
interest may be imposed by a court against a state, (2) that
government-wide policies require the use of the current value of
funds rate, not the private consumer rate, and (3) that even if
DHHS has the authority to impose interest at the consumer rate,

that authority only extends to debts owed to DHHS, not those owed to other federal agencies.

The first two of the State's arguments were addressed and rejected in Commonwealth of Pennsylvania Dept. of Public Welfare v. United States Dept. of Health and Human Services, 101 F.3d 939 (3d. Cir. 1996) ("Pennsylvania v. DHHS").  The court finds the reasoning of Pennsylvania v. DHHS persuasive.

In that case, DHHS, pursuant to 45 C.F.R. § 30.13(a), began charging interest at the rate of 15.125 percent per annum on a debt owed by the Pennsylvania Department of Public Welfare to DHHS thirty days after notice of the debt was issued.  Section 30.13 provides that "the Secretary [of DHHS] shall charge an annual rate of interest as fixed by the Secretary of the Treasury after taking into consideration private consumer rates of interest prevailing on the date that . . . [DHHS] becomes entitled to recovery."  The 15.125% amount represented the consumer rate of interest at the time notice was given.  Id. at 941.

In attacking the propriety of the 15.125 percent rate, Pennsylvania, as does the State here, relied upon language in United States v. Texas which states that "courts," when awarding

38

prejudgment interest, are to "weigh competing federal and state interests." <u>Texas</u>, 507 U.S. at 536.  Pennsylvania argued that Section 30.13(a) "violates the common law because it fails to require a case-by-case determination of whether or not interest is appropriate and, if so, how much interest should be charged. <u>Id.</u> at 942.

The Third Circuit found the reference to "courts" in the quoted language significant, noting that "the Court neither said, nor implied, anything about whether or not an agency could pre-specify the rate it was going to charge states that were delinquent on a particular class of debts." <u>Id.</u> at 943.  Finding no other authority supporting Pennsylvania's argument, the Third Circuit went on to hold that:

> Pennsylvania has not given us a basis to read into the federal government's common law right to charge the states interest the costly and cumbersome obligation that a federal agency make an individualized determination as to the appropriate interest rate in every case where a state owes a debt. To impose such additional costs on federal agencies would undermine their right to charge interest by significantly increasing the cost of charging such interest.

<u>Id.</u>

A similar result is warranted here.  The State has not presented to the court any authority, other than <u>Texas</u>,

39

supporting its claim that DHHS must balance federal and state interests before imposing interest.  Inasmuch as the agency is not required to undertake such an analysis under the common law, and inasmuch as Section 30.13 does not require such an analysis, DHHS may impose interest without weighing competing federal and state interests.

The State also argues that government-wide policies require the use of the current value of funds rate, and that DHHS acted arbitrarily and capriciously in charging the private consumer rate.  This argument is also without merit.  As stated in <u>Pennsylvania v. DHHS</u>, the federal claims collection standards provide the framework within which agencies must collect debts owed to the federal government, whether the agency is collecting a debt pursuant to the Debt Collection Act of 1982, the common law, or other statutory authority.  <u>Pennsylvania</u>, 101 F.3d at 933-34.  Interest on debts is to accrue from the date on which notice of the debt and the interest requirements is first mailed or hand-delivered to the debtor.  <u>Id.</u> at § 102.13(b).  The rate of interest typically assessed on such debts is the rate of the current value of funds to the United States Treasury (i.e., the Treasury tax and loan account rate), as prescribed and published by the Secretary of the Treasury in the Federal Register and the

Treasury Fiscal Requirements Manual Bulletins.  Id. at §
102.13(c).  An agency, however, may assess a rate of interest
higher than the current value of funds rate if it reasonably
determines that a higher rate is necessary to protect the
interests of the United States.  Id.; Pennsylvania v. DHHS, 101
F.3d at 944.  Pursuant to this authority, DHHS promulgated 45
C.F.R. § 30.13, which allows the imposition of interest at the
consumer rate, as established from time to time by the Secretary
of the Treasury.  That is "almost per se reasonable, but is
doubly so where the agency in question is seeking to provide its
debtors with incentives to clear their debts promptly."
Pennsylvania v. DHHS, at 944.

     The court is not empowered to substitute its judgment
for that of the agency unless the agency's action was irrational,
not based on relevant factors, or outside statutory authority.
Overton Park, 401 U.S. 402, 416, (1971).  None of those
conditions are present here, where the agency acted pursuant to
express regulatory authority.  Accordingly, DHHS may charge
interest on debts owed to it at the consumer rate of interest.[11]

_____

     [11]As noted in the companion memorandum opinion and order
entered this same day, plaintiffs assert, without comment from
defendants, that 45 C.F.R. § 30.13 has been renumbered and
rephrased as follows since entry of the March 31, 1999,
memorandum opinion and order:

41

What DHHS may lack authorization to do, however, is charge the consumer rate of interest on debts owed to other agencies.  It is undisputed that the DHHS disallowance represents an aggregate of overcharges made by the State to a number of federal agencies.  (AR, 282).  Chapter 45, Parts 30.1-30.35 of the Code of Federal Regulations applies to debts owed to the United States being collected by the Department of Health and Human Services. 45 C.F.R. § 30.1(a).  The regulation itself provides that its standards and procedures will only be applied

---

Unless a different rate is prescribed by statute, contract, or a repayment agreement, the rate of interest charged shall be the rate established annually by the Secretary of the Treasury pursuant to 31 U.S.C. 3717. The Department may charge a higher rate if necessary to protect the rights of the United States and the Secretary has determined and documented a higher rate for delinquent debt is required to protect the Government's interests. Any such higher rate of interest charged will be based on Treasury's quarterly rate certification to the U.S. Public Health Service for delinquencies in the National Research Services Awards and the National Health Services Corps Scholarship Program. The Department publishes this rate in the Federal Register quarterly.

45 C.F.R. § 30.18(b)(2).  Plaintiffs assert in their response to defendants' motion for a status conference that this amended regulation has eliminated defendants' authority to charge the consumer rate.  Inasmuch as plaintiffs have not formally moved for reconsideration on the point, and without input from DHHS, the court declines at this juncture to apply the revised regulation.  This interest component, like that discussed within, may be addressed on remand administratively in the first instance.

where a statute, regulation, or contract does not prescribe
different standards or procedures.  Id. at § 30.1(b).

        In this case, DHHS made no findings with respect to
what portions of the aggregate disallowance are attributable to
what specific federal agencies.  It is unclear what portions of
the disallowance represents overcharges made to DHHS, if any, and
what portions represent overcharges made to other agencies.
Accordingly, it is not possible for the court to determine, as
required by 45 C.F.R. § 30.1(b), whether "a statute, regulation
or contract" prescribes "different standards or procedures" in
this case.

        That being so, the court finds that DHHS's reliance on
45 C.F.R. § 30.13 to impose the consumer rate of interest on an
aggregate disallowance, without making proper findings as to the
specific components of the disallowance, was arbitrary and
capricious.  Without such findings, neither DHHS nor the court
can determine whether any other law governs the imposition of
interest, in whole or in part, in this lawsuit.  Accordingly, the
court must set aside the agency's imposition of interest at the
consumer rate and remand the case for further findings.  If the
agency wishes to impose interest at the consumer rate, it must,
on remand, specifically determine how the aggregate disallowance

is divided among the affected federal agencies and then discern whether those agencies must impose interest charges based on practices and procedures other than those employed by DHHS.


VII.   Offset


The State claims in Count V of its complaint that the PERS disallowance should be offset by the amount the United States allegedly owes the State's Insurance Agency Fund.  The State asks that the court set aside DHHS's denial of the State's offset request as contrary to law.  The State argues that DHHS's failure to itemize its disallowance on a program-specific basis renders its denial of the State's offset claim unlawful, inasmuch as the State cannot, based on information at hand, ascertain whether the agencies that are owed money by the State also owe money to the State.

The court has already concluded that DHHS had no obligation to itemize its audit findings so that the State could determine what portion of the disallowance was allocable to each affected federal agency.  Accordingly, its failure to do so does not render its denial of the State's offset claim arbitrary, capricious, or an abuse of discretion.

**44**

The State further contends that DHHS's failure to audit the Insurance Agency Fund estops it from denying the State's offset request.  Defendants argue that the State cannot raise its estoppel argument here because it was not raised before the agency.  In response, the State contends that DHHS waived the exhaustion defense by failing to plead it in its answer.  As noted by defendants, however, the doctrine of issue exhaustion is akin to a jurisdictional requirement.  Ibarra v. United States, 120 F.3d 472, 476 (4th Cir. 1997) (affirming dismissal for lack of subject matter jurisdiction on exhaustion grounds); See also Pleasant Valley Hospital, Inc. v. Shalala, 32 F. 3d 67, 70 (4th Cir. 1994) (stating that issue exhaustion is a prudential jurisdictional bar, and affirming dismissal for lack of subject matter jurisdiction on the basis of failure to raise an issue before the agency).  Questions concerning subject-matter jurisdiction may be raised at any time by either party.  Plyler v. Moore, 129 F.3d 728, 731 (4th Cir. 1997).  It is thus appropriate for defendants to raise their exhaustion arguments in their motion for summary judgment.

The State urges that it did raise the estoppel issue before the agency.  The citations to the Administrative Record proffered by the State in support of its argument, however,

45

indicate such is not the case.  (Plaintiffs' Response, at 31

(citing AR 19-21, 75-76, 93-95)).  Although these portions of the

record indicate that the State requested an offset of alleged

Insurance Agency Fund debts against its disallowance, there is no

mention of estoppel.  Rather, the State simply argued that an

offset was proper in light of the United States' alleged debt to

the Insurance Agency Fund.

        Consequently, the court finds that the State did not

raise its estoppel argument before the agency.  In the absence of

an applicable exception, the doctrine set forth in Pleasant

Valley is controlling.  Under these circumstances, no such

exception can be applied.  Unlike the purely legal arguments

raised with respect to DHHS's audit authority and DHHS's

authority to impose interest, the State's estoppel argument

creates a mixed question of law and fact.  It would be

inappropriate for the court to apply the exception explained in

Atlantic Richfield Co. v. U.S. Dep't of Energy, 769 F.2d at 782

and Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n, 707

F.2d at 1488-1489.  No other potential exceptions are presented

by the State.  Thus, the court is without subject matter

jurisdiction to address the state's estoppel argument.[12]
<u>Pleasant Valley Hosp.</u>, 32 F.3d at 70.

      In any event, the State does not have the right to
require the offset it desires in this case.  Circular A-87, which
governs DHHS's administration of federal grants, as well as
administration performed by other agencies, provides that "[a]ny
cost allocable to a particular grant or cost objective under the
principles provided for in this Circular may not be shifted to
other federal grant programs to overcome fund deficiencies, avoid
restrictions imposed by law or grant agreements, or for other
reason."  Circular A-87, ¶ C.2.b.  A "grant" is defined as any
agreement between the United States and a State, local, or Indian
tribal government whereby the United States provides funds to
carry out specified programs.  <u>Id.</u>  ¶ B.7.  A "grant program" is
defined as "those activities and operations of the grantee which
are necessary to carry out the purpose of the grant."  <u>Id.</u>  ¶

_____

      [12]  Even if the court had jurisdiction to hear the State's
estoppel claim, it appears that the State cannot prove, as
required, that it detrimentally relied on DHHS's initiation of
the Insurance Agency Fund audit.  When the State discovered the
Insurance Agency Fund audit had been terminated, it performed its
own audit, and submitted the audit findings to DHHS.  The
findings were in the hands of DHHS throughout the agency
proceedings.  Additionally, as noted by DHHS, the State has not
filed a formal claim for the alleged debt.  Nor has it sought a
waiver of any limitations period which may apply to its claim.

B.8.  At issue in this case are costs which were originally allocated by a grant to PERS, a grant program designed to provide pension benefits to state employees.  After it was discovered that the funds allocated to PERS were in excess of proper amounts, the State sought to have the excess funds shifted to the Insurance Agency Fund, a grant program which provides medical insurance to state employees.  Such shifting is impermissible under ¶ C.2.b.  Accordingly, the State's offset request is precluded by DHHS's own regulations.

The defendants are, therefore, entitled to summary judgment with respect to Count V of the State's complaint.[13]

## VIII.  Conclusion

For the reasons stated, it is ORDERED that plaintiffs' motion for summary judgment be, and it hereby is denied.  It is further ORDERED that this case be, and it hereby is, remanded to the United States Department of Health and Human Services for the

---

[13]  DHHS also argues that allowing debts owed by the State to one federal subsidized program (PERS) to be offset by debts owed to the State by another (the Insurance Agency Fund) would violate the Appropriations Clause of the United States Constitution.  U.S. Const. Art. 1, § 9, cl. 7.  Inasmuch as the court has concluded, on other grounds, that DHHS is not required to recognize the State's claimed offset within the parameters of this case, the court need not address that issue.

purpose of allowing the agency, if it wishes to impose post-disallowance interest upon the State's debt, whether at the consumer rate or otherwise, to specifically determine, within four months from the entry date of this order, how the aggregate disallowance imposed against the State is divided among each affected federal agency and to determine the rate and amount of interest, together with the rationale therefor, applicable as to the sums owing to each such agency.  It is further ORDERED that defendants' motion for summary judgment be, and it hereby is, granted with respect to Counts I, II, III, and V of the complaint and denied in all other respects.  Judgment shall be entered accordingly.

      The Clerk is directed to forward copies of this order to all counsel of record.

DATED: September 30, 2009

John T. Copenhaver, Jr.
United States District Judge